UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------x
                                                 :
NML CAPITAL, LTD.,                               :          **OPINION**
                                                 :
                              Plaintiff,          :      03 Civ. 8845 (TPG)
                                                 :      05 Civ. 2434 (TPG)
                 – against –                      :      06 Civ. 6466 (TPG)
                                                 :      07 Civ. 1910 (TPG)
THE REPUBLIC OF ARGENTINA,                       :      07 Civ. 2690 (TPG)
                                                 :      07 Civ. 6563 (TPG)
                              Defendant.          :      08 Civ. 2541 (TPG)
                                                 :      08 Civ. 3302 (TPG)
                                                 :      08 Civ. 6978 (TPG)
                                                 :      09 Civ. 1707 (TPG)
                                                 :      09 Civ. 1708 (TPG)
                                                 :
------------------------------------------------x

NML Capital, Ltd. ("NML") in these actions owns defaulted bonds issued by defendant, the Republic of Argentina ("Republic").  NML has been awarded five final judgments against the Republic for a total of about $1.6 billion.  On February 7, 2011, NML applied for, and the court signed, an ex parte order of attachment directed to assets of the Republic held at Honeywell International, Inc. in the name of Empresa Argentina de Soluciones Satelitales, S.A. ("AR-SAT").  NML now moves to confirm the order of attachment, and non-party AR-SAT and the Republic ("Defendants") cross-move to vacate the order of attachment.  AR-SAT also cross-moves to recover damages for wrongful attachment.

NML's motion to confirm the order of attachment is denied.  The cross-motion of AR-SAT and the Republic is granted, and the February 7, 2011 order of attachment is vacated. The court denies AR-SAT's cross-motion for damages.

## **Background**

Procedural History

NML has eleven actions in this court pertaining to the Republic's bond default in 2001.  NML has been awarded five final judgments against the Republic for a total of about $1.6 billion.  NML has an additional six causes of action pending before the court for money judgments in favor of NML and against the Republic for a total of about $908 million.

On February 7, 2011, the court ordered an ex parte attachment of certain property of AR-SAT in the possession of Honeywell.  The attachment order purported to reach:

> Any property in the United States . . . which could be assigned or transferred as provided in N.Y. C.P.L.R. § 5201, including but not limited to Reaction Wheel Assemblies, Miniature Inertial Measurement Units, contractual rights, cash, gold, special drawing rights, deposits, real property, instruments, securities, security entitlements, security accounts, equity interests, and claims, and interests of any kind in the foregoing, directly or indirectly held or maintained in the name of, in a trust held by, or for the use or benefit of AR-SAT or Argentina, and any debt due or to become due to AR-SAT or Argentina from [Honeywell].

On February 8 and 9, 2011, NML levied the order of attachment, and on February 11, the U.S. Marshals Service levied the order of attachment.  In its garnishee statement of February 14, 2011,  Honeywell stated that it "does not have in its possession or custody any assets or property that are located within the State of New York in which the [Republic] has any interest, either on its own behalf or in the name of [AR-SAT]."  However, Honeywell reported holding

2

six items that are the property of AR-SAT located in other states than New York:  two "MIMU Inertial Reference Units" and four "HR 12-25RWAs (Reaction Wheel Assembly)."  These assets have a combined value of $2,424,600.

Plaintiffs moved to confirm the order of attachment, and the Republic and AR-SAT cross-moved to vacate the order of attachment.  AR-SAT also cross-moved to recover damages for wrongful attachment.

The parties submitted several declarations setting forth facts relevant to this dispute.  Although they dispute the nature of the Republic's interest in these assets, they generally agree about many of the basic facts.  Therefore, except where otherwise indicated, the facts set forth below are undisputed.

Facts

AR-SAT is a corporation created by the Argentine Congress on April 5, 2006 pursuant to the Argentine Satellite Solutions Company Act No. 26,092. AR-SAT was created to promote the design, development, construction, launching, and/or commissioning of geostationary telecommunication satellites in the coordinates and frequency bands provided by the International Telecommunications Unit ("I.T.U.").  The I.T.U. had granted the Republic the use of the orbital position of 81 Degrees West and its associated frequency bands.  Failure to utilize the orbital slot could cause the Republic to forfeit it. Thus, the Republic created AR-SAT and granted it the right to use the 81 Degrees West orbital slot in exchange for payment of .5% of AR-SAT's gross revenues.  By Legislative Decree No. 626/2007, the Republic also transferred

the 72 Degrees West orbital position to AR-SAT.  AR-SAT may not assign or

transfer the user permit without authorization from the Republic.

AR-SAT provides satellite capacity across South America, which is used

to provide services for corporate networks, government networks, rural

telephone services, mobile phone networks, trunking for long distance carriers,

audio and video broadcasts, direct TV broadcasts, digital television, internet,

video and audio services.  Satellite customers pay AR-SAT a fee for that use.  In

addition to contracts within Argentina, AR-SAT has contracts within other

countries in South America to provide satellite services.  Millions of people in

South America rely on AR-SAT to provide them with their television, telephone,

and internet needs.

According to its website, AR-SAT's mission is:

> - To keep and exploit the orbital locations assigned
> and to-be-assigned by the International
> Telecommunications Association of the Argentine
> Republic;
>
> - To provide the argentine space industry through
> national design and production of telecommunications'
> geostationary satellites;
>
> - To increase satellite services provided in the country
> for business, public and government applications.

See AR-SAT website, "Our Mission," available at http://www.arsat.com.ar/

ingles/mision.html (last visited April 13, 2011).  In a speech delivered in July

2005 to the Argentine Congress, former President Nestór Kirchner stated that

the satellite networks would be used for various commercial services, and that

the orbital positions constituted a "scare and limited resource that must be

used for the public interest with a view to the common welfare."  Kirchner

further stated that "lack of use would lead to potential loss for the National

State, neglecting strategic aspects of security and defense."  He noted that the

company's activities would be subject to general and not administrative laws

due to the commercial nature embodied in its purpose.

By law, AR-SAT is wholly owned by the government.  Ninety-eight

percent of AR-SAT's stock is owned by the Ministry of Federal Planning, Public

Investment and Services.  The remaining two percent is owned by the Ministry

of Economy and Production.  AR-SAT is a "sociedad anónima," which is a stock

corporation that is an independent, juridical entity with its own legal

personality.  The corporation is governed by "private law," rather than by public

or administrative law.  AR-SAT was initially funded through a 50 million peso

investment by the Republic pursuant to Administrative Decision 281/2006.

AR-SAT is governed by a board of directors composed of five individuals

who are neither public officials nor public employees.  The board is appointed

at the annual shareholders' meeting, as provided for in Article 8 and 9 of the

corporate bylaws.[1]  Each board member receives an independent employment

contract.  Board members can only be removed by a shareholder vote at the

board's general meeting.  Board resolutions cannot be revised by any

---

[1] NML claims that the five-member board is appointed by the Republic's Minister of Federal
Planning, Public Investment, and Services pursuant to Decree 634/2006, Article 4.  However,
this Decree establishes the powers of the National Executive to perform all acts necessary of
the establishment and start-up of the company.  The board is thereafter appointed pursuant to
the company's bylaws.

governmental minister or the Executive Branch.  Any challenge to a decision must be made through the judiciary under Article 4 of Decree No. 1883/91.

By law, the board has fiduciary duties towards AR-SAT.  Under Law No. 19,550, the board must act with loyalty towards AR-SAT and with the diligence of a prudent businessman in making its decisions.  The board is liable for the proper preservation of company assets.  Each board member is personally, jointly and severally liable for the consequences of decisions made, and may be criminally liable for the impact of any misconduct in performing duties.

Pursuant to its bylaws, AR-SAT has an internal oversight and audit board called the Supervisory Committee, which ensures that the company complies with all applicable laws.  The members of this committee are personally, jointly and severally liable for their actions, and may also be held criminally liable for their actions.

AR-SAT is authorized to issue bonds and other securities, enter into contracts, pursue legal actions, and hire employees.  AR-SAT's bank accounts are entirely independent from the federal government.  The Republic cannot use any of AR-SAT's funds.  AR-SAT's accounts can only be operated and accessed with the signature of two employees from AR-SAT.

AR-SAT does not pay taxes to the government.  Other satellite companies do not pay taxes because they were either given exemptions by their nation of origin or could not be taxed since the satellites were operating in space.  In order to put AR-SAT on equal footing with other competitive satellite

companies, the legislature thus exempted AR-SAT from paying taxes.

Currently, AR-SAT does not operate its own satellites.  Instead, AR-SAT has the rights to the two orbital slots already mentioned which it leases to satellite companies.  These satellite companies in turn provide satellite services for AR-SAT.  The 81 Degrees West orbital slot is currently serviced by INTELSAT, a private U.S. satellite company.  In November 2006, AR-SAT launched a bidding process to find a satellite company who could temporarily operate and occupy the orbital slot until AR-SAT's satellite program is operational.  From December 2006 until February 2007, AR-SAT sent twelve invitations to satellite facility operators.  AR-SAT states that the Ministry of Federal Planning, Public Investment and Service was not involved in this process.  AR-SAT also states that because this was an independent bidding process, AR-SAT did not have to comply with any governmental requirements such as providing notice for bids on government contracts.  AR-SAT asserts that after this independent bidding process was completed, AR-SAT independently decided to award the contract to INTELSAT.  In May 2007, as part of the contractual obligations of AR-SAT and INTELSAT, the National Communications Commission authorized AR-SAT to contract with INTELSAT to place the satellite pursuant to Resolution 67/2007.  Similarly, INTELSAT was required to receive authorization from the U.S. Federal Communications Commission.

AR-SAT has undertaken a project to construct and launch three

satellites to service its orbital positions.  Accordingly, AR-SAT has entered into various contracts to acquire the parts and equipment needed to construct two of the three new satellites.  These satellites will be constructed and tested in Argentina.  The satellites' actual operation will take place in space.

One such contract that AR-SAT has entered into is a contract with Honeywell Defense & Space, a division of Honeywell International, Inc. ("Honeywell").  For the contracted price of $2.4 million, Honeywell will provide AR-SAT with the navigational control for the first of the two satellites currently being built in Argentina, named AR-SAT-1.  These parts are the Reaction Wheel Assemblies and the Miniature Inertial Measurement Units (the "Navigational Controls")—the assets at issue now in this case.  AR-SAT will wire payments to Honeywell through AR-SAT's private bank in Argentina.  These parts are being constructed by Honeywell in the United States and then will be shipped to Argentina where they will be incorporated into the larger satellite.  The contract states that the delivery terms are "EXWORKS (Incoterms 2000), Seller's Facility."  "EXWORKS" means that the seller delivers when he "places the goods at the disposal of the buyer at the seller's premises . . . not cleared for export and not loaded on any collection vehicle."  See INCOTERMS 2000, Preambles, EXW, available at http://www.iccwbo.org/incoterms/preambles/pdf/EXW. pdf.[2]  At the time of the attachment, AR-SAT states that title had not yet

---

[2] INCOTERMS are a series of international sales terms that are published by International Chamber of Commerce and are used in international commercial transactions.

passed to it.

AR-SAT-1 is scheduled to launch in 2012 and will provide data, telephone and television transmission services for Argentina, Chile, Uruguay, Paraguay and Bolivia.  If delivery is delayed, AR-SAT states that they will have to rent satellite capacity at a cost of $1,846,759 per month.

## **Discussion**

### Ownership of Attached Assets

Under the Federal Rules of Civil Procedure, a federal court employs the attachment procedures provided by the law of the state in which the court sits. See Fed. R. Civ. Pro. 64.  The New York Civil Practice Law and Rules ("CPLR") therefore govern the attachment of assets under this order.[3]

Attachments must be issued against "property which could be assigned or transferred, whether it consists of a present or future right or interest and whether or not it is vested."  CPLR §§ 5201(b); 6202.[4]  If the attachment is served on a person other than the defendant, that person must, at the time of service, owe a debt to the defendant or be "in the possession or custody of property in which such person knows or has reason to believe" that the

---

[3] Effective August 30, 2010, Section 6205 to the CPLR provides that: "An order of attachment may be granted in aid of execution to a party that has been awarded a money judgment against a foreign state, as defined in 28 United States Code Section 1603, in accordance with and subject to the limitations of 28 United States Code Section 1610 and other applicable law."
[4] Defendants separately argue that, even if AR-SAT were found to be part of the Republic, AR-SAT does not yet own or possess the assets at issue.  However, N.Y. C.P.L.R. § 5201(b) permits enforcement of a money judgment against "any property which could be assigned or transferred, whether it consists of a present or future right or interest and whether or not it is vested."  See Capital Ventures Int'l v. Republic of Arg., 443 F.3d 214, 220 n. 4 (2d Cir. 2006). AR-SAT has an interest in the Navigational Controls that could be assigned or transferred, as specified by its contract with Honeywell.

defendant has an interest.  § 6214(b).

For an order of attachment to be confirmed, a plaintiff must satisfy three additional requirements.  First, one of five statutory grounds for attachment must exist.  CPLR § 6201.  One of these grounds is that the defendant is not a domiciliary of New York.  §6201(1).  Second, the plaintiff must establish that it has a cause of action, that it is likely to succeed on the merits, and that the amount demanded from the defendant exceeds the defendant's known counterclaims against the plaintiff.  CPLR § 6212.  Third, the plaintiff must establish a need for continuing the attachment.  CPLR § 6213.

NML has indisputably satisfied most of these requirements.  First, the Republic is a nondomiciliary residing outside New York.  Second, NML has a cause of action and is likely to succeed on the merits, given the Republic's undisputed liability in these actions.  Third, since the Republic has not asserted counterclaims against NML, the amounts sought by NML exceed the value of the Republic's counterclaims.  Fourth, there is a need to continue the attachments, since the assets could be immediately transferred outside the United States if the court's orders were vacated.

All this raises the issue, of course, of whether the Republic indeed has an interest in the attached property or at least will when the property is delivered.  This brings the matter within the ambit of the Foreign Sovereign Immunities Act ("FSIA").  The FSIA distinguishes the sovereign state from an agency or instrumentality of the sovereign state.  There are somewhat different rules

about attachments depending on whether it is the sovereign's property or an instrumentality's property.

NML's sole argument in this regard is that the Navigational Controls are the property of the Republic because AR-SAT is part of the Republic.  NML makes no argument that AR-SAT's assets can be attached if AR-SAT is an agency or instrumentality.  Thus, the sole issue here is whether NML has proven that AR-SAT is a part of the Republic, or is an agency or instrumentality and is <u>not</u> part of the Republic itself.

The FSIA defines an "agency or instrumentality" of a foreign state as "any entity" which is "a separate legal person" and "a majority of whose shares or other ownership interest is owned by a foreign state."  28 U.S.C. § 1603(b)(1)-(2).  NML argues that AR-SAT is not a "separate legal person" because it operates as a political organ of the state, such that "no meaningful legal distinction" can be drawn between the two.  <u>Garb v. Republic of Poland</u>, 440 F.3d 579, 592 (2d Cir. 2006) (quoting <u>Compagnie Noga D'Importation Et D'Exp. S.A. v. Russian Fed'n</u>, 361 F.3d 676, 688 (2d Cir. 2004)).  The Second Circuit follows the "core functions" test first articulated in <u>Transaero, Inc. v. La Fuerza Aerea Boliviana</u>, 30 F.3d 148 (D.C. Cir. 1994).  Whether AR-SAT is a separate legal person for purposes of the FSIA turns on whether its core functions are predominantly governmental or commercial.

NML argues that AR-SAT's "core functions" are governmental because AR-SAT maintains and exploits Argentina's orbital slots, promotes the

11

Argentine space industry, and supplies telecommunications bandwidth capacity to various government agencies.  NML asserts that the slots are politically important because government officials managed them before AR-SAT's formation.  AR-SAT's maintenance and exploitation of the orbital slots is certainly significant, and evidently of great national importance to the executive branch.

Nonetheless, AR-SAT is a stock corporation with its own board of directors, corporate bylaws, and full legal capacity to acquire rights, contract obligations and execute all acts permitted by law.  AR-SAT provides satellite capacity across South America in order to provide various commercial services. Satellite customers pay AR-SAT a fee for that use.  It is clear that AR-SAT's structure and core function are both commercial in nature.  AR-SAT is most certainly a "separate legal person."

AR-SAT meets all the requirements of Section 1603(b), and is an "agency or instrumentality" of the Republic for purposes of the FSIA.  "Government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such."  First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba (Bancec), 462 U.S. 611, 626-27 (1983).

NML has failed to prove that the property in question is the property of the Republic.  It is or will be the property of an agency or instrumentality.  It is not subject to attachment in this case.

Commercial Activity under Section 1610(a) of the FSIA

Even if AR-SAT were found to be part of the Republic, NML's attachment would not be valid.

Under the FSIA, "the property in the United States of a foreign state shall be immune from attachment, arrest and execution except as provided in sections 1610 and 1611 of this chapter."  28 U.S.C. § 1609.  Section 1610(a) provides that the "property in the United States of a foreign sovereign state . . . used for a commercial activity in the United States, shall not be immune from attachment in aid of execution, or from execution . . . if (a) the property is or was used for the commercial activity upon which the claim is based."  Section 1610(a) requires not that property "will be used" or "could potentially be used" for commercial activity, but that the property "must be used" for commercial activity upon a judgment entered by a court.  Aurelius Capital Partners, LP v. Republic of Arg., 584 F.3d 120, 130 (2d Cir. 2009).  Furthermore, the property "in the hands of the Republic must have been 'used for a commercial activity.'" Id. at 131 (emphasis in original).  The FSIA defines "commercial activity" as "either a regular course of commercial conduct or a particular commercial transaction or act."  28 U.S.C. § 1603(d).

While a contract to purchase goods in the United States constitutes commercial activity, that property is not subject to attachment if it is not itself "used for" commercial activity within our borders.  See Republic of Arg. v. Weltover, Inc., 504 U.S. 607, 614-15 (1992); Texas Trading & Milling Corp. v.

<u>Federal Republic of Nigeria</u>, 647 F.2d 300, 309 (2d Cir.1981) (overruled for other reasons); <u>Conn. Bank of Commerce v. Republic of Congo</u>, 309 F.3d 240, 251 (5th Cir. 2002).  The Navigational Controls at the time of attachment and now are being constructed by Honeywell and are not being used for commercial activity.

<u>Damages for Wrongful Attachment</u>

AR-SAT requests costs, damages and attorney's fees pursuant to Article 62 of the N.Y. C.P.L.R. to compensate for NML's wrongful attachment of the Navigational Controls.  NML is being compelled to find ways to circumvent the failure of the Republic to pay its judgment debt in order to recover its judgments.  The court will not award damages here for the wrongful attachment.

## **Conclusion**

For the foregoing reasons, NML's motion to confirm the order of attachment is denied.  The cross-motion of AR-SAT and the Republic is granted, and the February 7, 2011 order of attachment is vacated. The court denies AR-SAT's cross-motion for damages.

This opinion resolves the motions listed as document numbers 406, 417, and 422 in case 03 Civ. 8845, as well as the same motions in the related cases.

SO ORDERED.

Dated:  New York, New York
        April 21, 2011

Thomas P. Griesa
U.S.D.J.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 04/22/11

15